## SINGER MFG. CO. v. UNITED STATES
### and five other cases.
### Nos. 45537–45539, 45790–45795.

United States Court of Claims.
Decided Jan. 3, 1950.

Albert L. Hopkins, Chicago, Ill., for plaintiffs. Winthrop, Stimson, Putnam & Roberts, New York City, and Hopkins, Sutter, Halls, DeWolfe & Owen, Chicago, Ill., were on the brief.

J. A. Rees, Washington, D. C., with whom was Assistant Attorney General Theron Lamar Caudle, for defendant. Andrew D. Sharpe, Ellis N. Slack, and Harry Marselli, Special Assistants to the Attorney General, were on the brief.

Before JONES, Chief Judge, and MADDEN, LITTLETON, WHITAKER and HOWELL, Judges.

MADDEN, Judge.

There are two issues in these suits. The first is whether The Singer Manufacturing Company, which sustained a loss in 1926 on the liquidation of its wholly owned subsidiary, Hamel Shoe Machinery Company, could deduct that loss from its 1926 income, in view of additional facts hereinafter recited. The second is whether credit on its American income tax liability may be taken by The Singer Manufacturing Company for payments made, it says on its behalf, to the Kingdom of Italy in each of the years from 1926 to 1933, except 1932. Many plaintiffs in addition to The Singer Manufacturing Company are named in the titles to these suits. They are all affiliates of that company, and have requested that any judgment rendered be rendered in favor of that company.

## Loss on Liquidation of Hamel Shoe Machinery Company

As to the Hamel Shoe Machinery Company issue, the essential facts are these. That company was, from 1916 to 1926, wholly owned by The Singer Manufacturing Company, which we will hereinafter call Singer, or American Singer. From 1918 to 1926, Hamel joined with Singer and other affiliates of Singer in filing consolidated income tax returns. Hamel was liquidated in 1926 at a loss to Singer of $1,413,148.99.

The Revenue Act of 1926 provided:

### Deductions Allowed Corporations

"Sec. 234(a). In computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

\* \* \* \* \* \*

"(4) Losses sustained during the taxable year and not compensated for by insurance or otherwise. \* \* \*". 26 U.S.C.A., Int. Rev.Acts, pages 185, 186.

Hamel had operating losses in each of the years 1918 to 1926 except 1923. Those operating losses were shown in the consolidated returns of the Singer affiliates for each of those years. Singer concedes that under the doctrine of McLaughlin v. Pacific Lumber Co., 293 U.S. 351, 55 S.Ct. 219, 79 L.Ed. 423, those of Hamel's losses that were subtracted from Singer's income in its annual returns cannot again be taken as losses in 1926. But, Singer contends, Hamel's losses for the years 1918, 1919, and 1920 should not be so deducted because in those years Singer had no taxable income, and hence there was nothing from which to deduct the Hamel losses, and there was no tax benefit to Singer.

The figures with regard to the income of Singer and its affiliates for the years 1918, 1919, and 1920 are given in our Finding 15. They show that for 1919 Singer itself had a loss of $26,679,720.14, one affiliate a loss of $4,382,671.72, two other affiliates small losses, and Hamel a loss of $90,644.-79. The net loss of the group was $28,853,-871.72. It is apparent that the group would still have had no income tax to pay if Hamel had not had a loss, or had had an income of any amount less than enough to wipe out the large loss of the group. So Singer did not, in fact, obtain any tax benefit from Hamel's 1919 loss of $90,644.79. In 1918 and 1920, Singer itself had income of $7,-608,829.95 and $13,038,613.92, respectively, and the consolidated group had income of $9,904,872.03 and $15,124,539.76, respectively. Hamel had losses in those years, so it would seem that its losses would have reduced the income and the taxes of the group. But, says Singer, that did it no good because its large unused loss for 1919 could, pursuant to Section 204 of the Revenue Act of 1918, 40 Stat. 1060, be carried back against its income for 1918 and, if more than sufficient to wipe out that income, the remainder could be carried forward against its 1920 income. Since, as the table shows, Singer's 1919 loss of 26 million plus was more than sufficient to cancel its 1918 and 1920 incomes of 7 and 13 millions, it would still have had no taxable income for any of those years even if Hamel had had no losses. And, Singer contends, the same is true of the affiliated group, since its consolidated losses for 1919 were some 4 millions greater than its income for 1918 and

1920 combined. This last contention of Singer is not valid. The privilege of carrying losses back and forward is not available to a consolidated group but only to the particular member of the group which has the losses. Federal Export Corp. v. U. S., 25 F.Supp. 109, 88 C.Cl. 60, 85–86, certiorari denied 308 U.S. 590, 60 S.Ct. 120, 84 L.Ed. 494; Swift and Co. v. U. S., 38 F.2d 365, 69 C.Cl. 171; Wilson and Co. v. U. S., 15 F.Supp. 332, 82 C.Cl. 261. Referring again to the table in Finding 15 we see that, limiting the carry-back and carry-forward to Singer itself, that reduces Singer's income to zero for each of the three years, but still leaves a consolidated income for the group, in spite of the Hamel losses. This means that the group's income, and income tax, was reduced by the Hamel losses in 1918 and 1920. Since Singer was a member of the group which had the benefit of the Hamel losses in 1918 and 1920, it cannot use those losses again upon the liquidation of Hamel in 1926. Greif Cooperage Corp. v. Commissioner, 3 Cir., 85 F.2d 365, 366.

We now consider the year 1919 separately. In that year, as the table shows, the group, as a group, had a loss of $28,853,871.72 and Hamel a loss of $90,644.79. The total loss of all the companies in the group which had losses was $31,159,425.83. The total income of all the companies in the group which had incomes was $2,305,554.11. The ratio of the Hamel losses to all the losses had by members of the group was $90,644.79 to $31,159,425.83. Applying this ratio to the consolidated loss of the group which was $28,853,871.72, the computation is

$$\frac{\$90{,}644.79}{\$31{,}159{,}425.83} \times \$28{,}853{,}871.72 = \$83{,}936.30$$

This computation is based upon Swift and Co. v. United States, 38 F.2d 365, 69 C.Cl. 171, where, in the footnote at page 200 the method is explained. In Walker Products Corporation, 30 B.T.A. 636, 644, the same method was applied. The then Board of Tax Appeals, now the Tax Court, said: " * * * the statutory net loss assignable to each member, which, considered separately, sustained a net loss, is the same proportion of the consolidated net loss which the net loss of the member is to the sum of the net losses of all the members sustaining net losses. The difference between the net loss sustained by the Luker Co. in 1923 and that portion of the consolidated net loss assignable to it is the amount which has been offset against the income of the companies having income * * *."

In the instant case, the difference between the Hamel loss in 1919, $90,644.79, and that portion of the consolidated net loss attributable to it, after setting off the income of the group, which portion was $83,936.30, was $6,708.49. This last amount was, then, the only part of the 1919 Hamel loss that was used to offset the 1919 group income in 1919, and to relieve the group of any income tax for that year. The balance of the Hamel loss, $83,936.30 should not, therefore, have been deducted from the loss of Singer on the liquidation of Hamel in 1926, and should have been allowed as a proper deduction from Singer's 1926 income.

### Credit for Italian taxes

For each of the years 1926–1933, except 1932, The Singer Manufacturing Company claims a credit for income taxes paid to the Kingdom of Italy.

Section 238(a) of the Revenue Act of 1926, 26 U.S.C.A.Int.Rev.Acts, page 188, says: "In the case of a domestic corporation the tax imposed by this title shall be credited with the amount of any income, war-profits, and excess-profits taxes paid or accrued during the same taxable year to any foreign country, * * *."

Article 382 of Regulations 69, applicable to the above section, says: "*Meaning of terms.*—The 'amount of any income, war-profits, and excess-profits, taxes paid or accrued during the taxable year' means taxes proper (no credit being given for amounts representing interest or penalties) paid or accrued during the taxable year on behalf of the individual claiming credit."

The applicable parts of the Revenue Acts of 1928 and 1932, and the Regulations thereunder, are practically identical with the quoted Section and Regulation.

In brief, the facts pertinent to this issue are the following. Prior to 1915 Singer products were sold in Italy through a branch of Singer Sewing Machine Company, a subsidiary of The Singer Manufacturing Company. In 1915 an Italian corporation was formed to handle such sales, the change being prompted largely by tax problems. All of the stock of the Italian Company was owned by International Securities Company, an affiliate in the Singer group. The Singer Manufacturing Company owned all the common stock of the Securities Company, which was one-third of the voting stock. Most of the rest of the stock of the Securities Company was owned by stockholders of the Manufacturing Company. One Sir Douglas Alexander was, during the years in question, the president of the Manufacturing Company and of the Italian Company. All sales to the Italian Company were made by the Manufacturing Company which will hereinafter in the discussion of this issue be usually called the American Company. In these sales, title to the goods passed in Italy.

After the formation of the Italian corporation, the Italian taxing authorities held it to be merely an agency or branch of the American Company. They insisted that the American Company was making a taxable profit in Italy, and must pay an income tax. In 1918 the American Company employed an Italian lawyer in Rome to undertake negotiations with the Italian Ministry of Finance to come to an agreement with regard to the taxing of the American Company's Italian income. As a result of these negotiations it was agreed that the Italian Government would treat as the American Company's Italian income seven percent of the price of the goods sold and invoiced by the American Company to the Italian Company, and that the Italian Company would pay that tax, as well as the tax on its own income. When, as we shall see, the American Company reimbursed the Italian Company for the tax so paid on the American Company's income, the Italian taxing authorities did not regard those receipts by the Italian Company as income.

The arrangement above recited was followed until 1925, when it was modified so that the seven percent was applied, not to all goods invoiced to the Italian Company within the year, but only to those goods so invoiced, and later sold by the Italian Company within the year. This was the arrangement during the years here in question.

Each year the Italian tax officials and the Italian Company signed a *concordato* or settlement showing the income on which the Italian Company would pay the tax. This income was determined by ascertaining the Italian Company's income in the normal way, and then adding a separate item *utile sul fatturato dalla casa madre* which is translated as "profit on what was invoiced by the parent company." This latter item was computed at seven percent of the price of the goods invoiced to and resold by the Italian Company during the year. The tax was computed on the sum of the Italian Company's income plus this last item so computed. The total amount of the tax was then sent to the Collector as a tax to be collected from the Italian Company, and it was paid by that company. The American Company, as we have said, reimbursed the Italian Company for the part of the tax attributable to the seven percent item. We shall refer hereinafter to a question regarding the time of the reimbursement.

The foregoing statement portrays a situation where the Italian Company acted merely as an agent or paymaster for the American Company, paying its tax on its behalf, and expecting to be and being reimbursed by its principal for its outlay. The Government urges that this is not the proper analysis of the situation. It says that what the Italian Company agreed in the *concordato* to pay and did pay, with regard to the seven percent item, was a part of the Italian Company's own income tax. It points, of course, to the *concordato,* which was executed only by the Italian Company and the tax authorities, and not by the American Company. But the manager of the Italian Company was also the agent of the American Company, paid only

by it, and authorized to act in its behalf in these tax matters. The Italian officials knew of this relationship and this authority. The absence of a signature of the American Company on the *concordato* seems to us to be only the omission of a formality. The American Company was mentioned in the *concordato*, in its reference to the *casa madre*.

As to including the seven percent estimated profit on the American Company's invoices in the income of the Italian Company, except as a convenient means of collecting it from the American Company, we do not see what reason there could have been for the inclusion. It was not, in fact, income or profit of the Italian Company. That company fully accounted, in the *concordato*, for its income. The profit covered by the seven percent item, and which, by the long-standing arrangement was an estimated amount, was clearly the profit of the American Company. The American Company was taxable upon its income earned in Italy, as this income was. The tax could have been assessed against it, without using the medium of the Italian Company. There would have been problems in regard to its collection, but it could, no doubt, have been collected. Instead of its being done in the direct but inconvenient way, it was done in the convenient and expedient way that we have described. We think that is no reason why we should disregard the substance of the transaction, and treat the form as controlling.

The Government says that the American Company's profits were far in excess of the seven percent on the basis of which these taxes were paid. We suppose that is irrelevant. To whatever extent it is true, our Government was the sole beneficiary, since whatever the American Company had paid the Italian Government it could have deducted from its tax bill at home.

The facts relating to the reimbursement of the Italian Company by the American Company are given in Finding 34. The Italian Company did not, until 1923, request reimbursement for the taxes paid by it to the Italian Government on the *casa madre* items for the years 1915 through 1922. Then reimbursement was promptly made. Again, for the years beginning with 1923, it did not, until 1930, request reimbursement. It was reimbursed and was directed to take credit for similar payments made in the future, at the time they were made. We think that the delay of the Italian Company in requesting reimbursement for some of the years in question does not either show that the transactions were different from what we have found them to be, or forfeit the plaintiff's right to credit for the taxes. We have found that the taxes were paid for, or on behalf of, the plaintiff. The fact that the financial affairs of the American and Italian Companies were so intermingled that these credits and reimbursements were not made promptly between them, does not, we think, affect the result.

The plaintiffs are entitled to recover. At the request of the plaintiffs, judgment will be entered only in favor of the plaintiff, The Singer Manufacturing Company. The entry of judgment will await the filing of a stipulation by the parties, showing the amount to which the plaintiff is entitled pursuant to our Findings of Fact and this Opinion, and including interest according to law.

It is so ordered.

JONES, Chief Judge, and HOWELL, WHITAKER and LITTLETON, Judges, concur.