GLEASON WORKS, PETITIONER v. COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 2651–70.   Filed June 15, 1972.

*Richard S. Fischer*, for the petitioner.
*Stephen M. Miller*, for the respondent.

OPINION

TANNENWALD, *Judge:* Respondent determined a deficiency in petitioner's income tax in the amount of $46,763.71 for the taxable year 1965. The sole issue for decision is whether petitioner is entitled to a foreign tax credit under section 901 [1] for the amount of British income tax on interest due from its wholly owned subsidiary and in respect of which tax was paid by the subsidiary and withheld by the subsidiary from its payment to petitioner pursuant to section 169 of the British Income Tax Act of 1952 (hereinafter sometimes referred to as I.T.A. 1952).

All of the facts have been stipulated. The stipulation, together with the exhibit attached thereto, is incorporated herein by this reference.

Petitioner is a New York corporation having its principal office and place of business in Rochester, N.Y., at the time of filing the petition herein. It filed its return for the taxable year 1965 with the district director of internal revenue, Buffalo, N.Y. Petitioner maintains its books and files its tax returns on the accrual basis of accounting.

Gleason Works, Ltd. (hereinafter referred to as Limited), is a wholly owned subsidiary of petitioner organized under the laws of

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise specified.

Great Britain in 1959 with its principal office and place of business in England.

During 1959, 1960, and 1961, petitioner loaned Limited $402,000 by way of cash advances and sold a substantial amount of equipment to Limited on an open account, the balance of which changed from month to month. Petitioner carried these amounts on its books as accounts receivable which bore interest charges of 4½ percent and 5½ percent. Petitioner did not accrue as income the yearly amounts of interest applicable to the receivables.[2]

As of December 31, 1964, Limited owed petitioner $221,839.43 for interest on the receivables. Of this amount, Limited, in 1965, paid petitioner the amount of $135,876.73, and it withheld the amount of British tax payable on income of $221,839.43, pursuant to section 169, I.T.A. 1952, to wit, $85,962.70.

On its return for 1965, petitioner reported as interest income the $135,876.73 which it received, added to this amount, i.e., "grossed up," the amount of British tax withheld by Limited ($85,962.70), and claimed a foreign tax credit in the amount of $85,962.70 under section 901.

Section 901(b)(1) permits a domestic corporation to claim a foreign tax credit for "the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country." Section 1.901–2(a), Income Tax Regs., provides:

The term "amount of any income * * * taxes paid or accrued during the taxable year" means taxes proper, paid or accrued during the taxable year on behalf of the taxpayer claiming credit. * * * [Emphasis added.]

Since it is not disputed that the tax in question was properly withheld by Limited from its payment to petitioner, pursuant to I.T.A. 1952, the only question is whether such tax was an income tax paid or accrued during the taxable year by petitioner or on its behalf.

The answer to this question depends upon the effect of section 169, I.T.A. 1952, and the possible contrasting effect of section 170, I.T.A. 1952. Insofar as concerns this case, the former section relates to interest payments "Out of Profits or Gains Already Taxed" and the latter section relates to interest payments "Not Made Out of Profits or Gains Already Taxed." See pp. 473–474 infra. Respondent apparently concedes that if the interest payments herein had been made pursuant to section 170, I.T.A. 1952, petitioner would have paid the British tax in question and would be entitled to the claimed foreign tax credit. But respondent contends herein that there is a crucial distinction between sections 169 and 170 and that, since it has been

---

[2] No issue has been raised herein as to whether such treatment by petitioner was proper for Federal income tax purposes.

stipulated that the interest payments herein were covered by section 169, petitioner's subsidiary paid the British tax on its own and not petitioner's behalf. Consequently, respondent asserts that petitioner is not entitled to the claimed foreign tax credit. Petitioner contends that the British tax was paid by it or on its behalf and that accordingly the claimed foreign tax credit should be allowed.

Resolution of the issue thus presented depends not only upon an analysis of British tax law but, more importantly, upon a clear understanding of the long and sometimes tortuous history of the operation of the foreign tax credit provisions of the Internal Revenue Code in relation to the British income tax. In our judgment, that understanding is an essential prerequisite to such analysis. See Holmes, The Common Law 37 (1923 ed.) : "The history of what the law has been is necessary to the knowledge of what the law is." Accordingly, we will first review that history in some detail. (For the analysis of British tax law, see pp. 472–479 *infra.*) In so doing, and in evaluating the impact of that history on our decision herein, we are mindful of the observation of Mr. Justice Holmes that "a page of history is worth a volume of logic." See *New York Trust Co.* v. *Eisner*, 256 U.S. 345, 349 (1921).

Our starting point is *Biddle* v. *Commissioner*, 302 U.S. 573 (1938). In that case, the British standard tax had been levied on a United Kingdom corporation's "profits or gains." The corporation then paid a dividend to United States taxpayers and withheld therefrom the portion of the tax it had paid "appropriate" to the dividend pursuant to Rule 20 of the British Income Tax Act of 1918.[3] The United States taxpayers claimed the right to report as income for United States income tax purposes the gross amount of the dividend (i.e., the amount received plus the amount withheld) and to take credit (up to the statutory limit) against their United States income tax for the amount withheld as "income * * * taxes paid or accrued" under section 131(a)(1) of the Revenue Act of 1928 (the predecessor of section 901(b)(1)). The Commissioner asserted that the British standard tax had been imposed on the British corporation, not the United States taxpayers, and that the latter were entitled to report for Federal income tax purposes merely the actual amount received without any credit for the amount withheld. The Supreme Court rejected the tax-

---

[3] "The profits or gains to be charged on any body of persons shall be computed in accordance with the provisions of this Act on the full amount of the same before any dividend thereof is made in respect of any share. right, or title thereto, and the body of persons paying such dividend shall be entitled to deduct the tax appropriate thereto." This rule was incorporated, in substantially the same terms, into sec. 184, I.T.A. 1952, and was repealed by Finance Act 1965, sch. 22, pt. IV, for years subsequent to the one involved herein. See p. 475 *infra.*

payers' contention.[4] The structure of its opinion has a direct bearing upon our analysis of the issue presented to us herein.

First, the Supreme Court established the principle that the determination as to whether a foreign income tax had been "paid or accrued" within the meaning of the Federal taxing statute was to be made in accordance with the criteria established by our own revenue laws and court decisions and not by "a shifting standard * * * adopted by reference to foreign characterizations and classifications of tax legislation." Hence the fact that British law "regarded" the standard tax as having been paid by the recipient of the dividend was "not conclusive" but at most "a factor to be considered in deciding whether the stockholder pays the tax within the meaning of our own statute." See *Biddle* v. *Commissioner*, 302 U.S. at 578–579; *Arundel Corp.* v. *United States*, 102 F. Supp. 1019, 1022 (Ct. Cl. 1952). Compare *Commissioner* v. *American Metal Co.*, 221 F.2d 134, 137 (C.A. 2, 1955); *Keasbey & Mattison Co.* v. *Rothensies*, 133 F. 2d 894, 897 (C.A. 3, 1943); *F. W. Woolworth Co.*, 54 T.C. 1233, 1260 (1970); *Lanman & Kemp-Barclay & Co. of Colombia*, 26 T.C. 582, 587 (1956).

Next, the Supreme Court examined the operation of the British income tax law as far as the standard tax "appropriate" to dividends was concerned. It concluded that the tax was legally imposed on the corporation and that the stockholder merely suffered the economic burden of the tax by virtue of the provision of the British law permitting the corporation to withhold the amount of the tax "appropriate" to the dividend which would otherwise have been paid to the stockholder.

Finally, the Supreme Court pointed out that although a stockholder in a United States corporation ultimately bears the economic burden of the income taxes paid by the corporation, our revenue laws give no recognition to that fact. Both the corporation and the stockholder are required to pay their respective taxes and our revenue laws "have never treated the stockholder for any purpose as paying the tax collected from the corporation." On this basis, the Court concluded

---

[4] Actually the history of the allowance of a foreign tax credit in respect of the British standard tax appropriate to a dividend begins with S.M. 3040, IV–1 C.B. 198 (1925), in which it was ruled that such credit was allowable. This ruling was reaffirmed and broadened, to permit a credit for the recipient of interest, the tax on which was withheld by the payor pursuant to Rule 19 of the British Income Tax Act of 1918 (predecessor of sec. 169, I.T.A. 1952), by S.M. 5363, V–1 C.B. 89 (1926). See also I.T. 2401, VII–1 C.B. 126 (1928); G.C.M. 3179, VII–1 C.B. 240 (1928). The Supreme Court, in *Biddle* v. *Commissioner*, 302 U.S. 573, 582 (1938), rejected the contention that these rulings had a binding effect. As a result of *Biddle*, the aforementioned rulings were revoked or modified so as to disallow a shareholder credit for the tax appropriate to dividends. See G.C.M. 19902, 1938–1 C.B. 354. Finally, S.M. 5363 was declared obsolete by Rev. Rul. 68–674, 1968–2 C.B. 609.

that to allow the claimed credit would extend to stockholders of a British corporation "a privilege not granted to stockholders in our own corporations." [5] See 302 U.S. at 581.

On the basis of the foregoing, the Supreme Court concluded that, although the recipient of the dividend bore the economic burden of the British standard tax, that was not sufficient to justify the conclusion that he should be allowed a credit for that tax. The fact that such economic burden resulted in his being "regarded" under British law as being liable for the tax could not be equated with having the tax imposed on the recipient of the dividend for purposes of our revenue laws. If the British standard tax could have been found to have been thus imposed, the credit would presumably have been allowed, despite the resulting inequality (see footnote 5, *supra*) between a United States stockholder in a United States corporation and such a stockholder in a United Kingdom corporation. Compare *Wisconsin Gas Co.* v. *United States*, 322 U.S. 526 (1944).

The next event after *Biddle* was the decision of the Board of Tax Appeals in *Crawford Music Corporation*, 40 B.T.A. 284 (1939). The question in that case was whether a foreign tax credit was allowable with respect to the British standard tax attributable to royalties on copyrights owned by nonresidents of the United Kingdom. The Board found that, under the British scheme of taxation, the standard tax was imposed upon the recipient of the royalties even though it was actually paid to the Crown by the payor of the royalties and, distinguishing *Biddle* on that ground, sustained the allowance of the credit.

Four years after *Biddle*, the Board of Tax Appeals was faced with a case involving a foreign tax credit claimed by a domestic corporation for the British standard tax on patent royalties, which (because payable out of profits) were covered by Rule 19 of the British Income Tax Act of 1918 (the predecessor of section 169, I.T.A. 1952). *Trico Products Corporation*, 46 B.T.A. 346 (1942), affirmed on another issue

---

[5] The following example clearly illustrates the inequality that would occur if a foreign tax credit had been allowed in *Biddle*. Assume a United States and United Kingdom corporate and individual tax rate of 50 percent and a United States corporation and a United Kingdom corporation each with $1,000 of taxable income and with only United States individual stockholders who have no other income or deductions. Each corporation pays a corporate tax of $500 and declares a dividend of $500. In the case of the United States corporation, the stockholders would pay $250 in tax and be left with $250 net. (The dividends-received exclusion has been ignored.) In the case of the United Kingdom corporation, the stockholders would pay the same tax and would be left in the same net position under *Biddle*. If, however, a foreign tax credit had been allowed in *Biddle*, such United States stockholders would have reported $1,000 as taxable income, on which there would have been a tax of $500 which would have been entirely offset by the credit. They thus would have been left with $500 net, or $250 more than the comparable stockholders in the United States corporation.

137 F. 2d 424 (C.A. 2, 1943).[6] The Board, believing the *Biddle* case indistinguishable, denied the taxpayer any credit, on the ground that the British tax had not been imposed upon the taxpayer. It contrasted its prior decision in *Crawford Music Corporation*, *supra*, on the ground that the British scheme for taxing royalties on copyrights not owned by United Kingdom residents differed from that applicable to patent royalties payable out of profits, in that the former were covered by Rule 21 of the British Income Tax Act of 1918 (the predecessor of section 170, I.T.A. 1952).

The next case, *Irving Air Chute Co.*, 1 T.C. 880 (1943), affd. 143 F. 2d 256 (C.A. 2, 1944), presented essentially the same facts as the *Trico Products* case.[7] The taxpayer, arguing that the record in *Trico Products* was incomplete, introduced the texts of numerous British cases and a lengthy deposition upon written interrogatories and cross-interrogatories of an English barrister-at-law who specialized in tax matters. The court concluded, however, on the authority of *Biddle* and *Trico Products*, that no credit could be allowed, the taxpayer having failed to offer a British case to the effect that when the British licensee paid the tax levied upon it without a deduction for royalties, it was accounting as an agent to the Crown for the tax withheld from the recipient under Rule 19 of the British Income Tax Act of 1918. Subsequent cases similarly denied the availability of the foreign tax credit in respect of the British standard tax relating to patent royalties. *International Standard Electric Corporation*, 1 T.C. 1153 (1943), affirmed and modified on other issues 144 F. 2d 487 (C.A. 2, 1944); *O. K. Tool Co.*, 4 T.C. 539 (1945); *Cleveland Graphite Bronze Co.*, 10 T.C. 974 (1948), affirmed per curiam 177 F. 2d 200 (C.A. 6, 1949).

In 1946, the result in *Biddle* was changed by the United States–United Kingdom Income Tax Convention, effective, as respects United States tax, for taxable years beginning on or after January 1, 1945. Article XIII of that Convention provided, in part, that:

the recipient of a dividend paid by a corporation which is a resident of the United Kingdom shall be deemed to have paid the United Kingdom income tax appropriate to such dividend if such recipient elects to include in his gross income for the purposes of United States tax the amount of such United Kingdom income tax. [60 Stat. 1377, 1384. See also Technical Memorandum of the Treasury Department on the Income Tax Convention, 2 CCH Tax Treaties 8137, 8140.]

Furthermore, article VIII of the convention negated the effect of *Irving Air Chute Co.*, *supra*, by providing that royalties derived from

---

[6] Although the Board was primarily concerned with patent royalties, it did note that a small amount of interest was involved and that the parties did not contend that these two items should be disposed of differently. *Trico Products Corporation*, 46 B.T.A. 346, 383, fn. 8 (1942).

[7] No amount of interest was involved, however.

sources within the United Kingdom by a United States resident, who is subject to United States tax on such royalties, would generally be exempt from the United Kingdom income tax on said royalties. 60 Stat. 1377 at 1382. See also Technical Memorandum of the Treasury Department on the Income Tax Convention, 2 CCH Tax Treaties at 3139.

Article VII of the treaty provided an exemption for interest income similar to that for royalties but specifically excepted from coverage "interest paid by a corporation resident in the United Kingdom to a United States corporation controlling * * * more than 50 percent of the entire voting power in the paying corporation." 60 Stat. at 1382. However, no deemed credit provision comparable to that made applicable to dividends by article XIII was included in respect of royalties or interest not entitled to such exemption.

The convention was amended by a supplementary protocol effective, as respects United States tax, for taxable years beginning on or after January 1, 1956. See [1958] 9 U.S.T. 1329. Article XIII was revised to provide that the recipient of any royalty "shall be deemed to have paid any United Kingdom tax legally deducted from the royalty or other amount by the person by or through whom any payment thereof is made" if the recipient includes the amount of such tax in his gross income. [1958] 9 U.S.T. at 1331.[8]

The point to make at this stage of the chronology is that there never was a conscious effort, with respect to creditability, to have one result as to royalty income and another as to interest. There was a problem as to royalty income because of the *Irving Air Chute* and *Trico Products* cases, and therefore royalties received the attention.[9]

Another supplementary protocol came into effect in 1966. See [1966] 17–1 U.S.T. 1254. It made substantial changes in the convention required as a result of extensive revisions in the United Kingdom scheme of taxation. See Statement by Stanley S. Surrey, Assistant Secretary of the Treasury, before the Senate Foreign Relations Subcommittee on Tax Conventions, 2 CCH Tax Treaties at 8167, *et seq.* Article VII was revised to eliminate the provision denying an exemption in the case of interest payments between certain parent and subsidiary corporations. See above. Article XIII was again amended to explicitly provide similar treatment for royalties and interest paid on or after April 6, 1966, with respect to the availability of a foreign tax credit.

---

[8] Sec. 905(b) was amended by the Technical Amendments Act of 1958 and in large part overlaps, but is slightly broader in scope than, the supplementary protocol discussed above. See H. Rept. No. 2632, 85th Cong., 2d Sess., pp. 41–42 (1958); Bittker & Ebb, Taxation of Foreign Income 439–441 (1960).

[9] The fact that *Trico Products* had actually involved a small amount of interest was apparently overlooked. See fn. 6 *supra.*

The Technical Memorandum of the Treasury Department, commenting on the 1966 supplementary protocol to the treaty, indicates that the question involved herein was thought to be still open in 1966, notwithstanding the *Biddle* case. See 2 CCH Tax Treaties at 8159–8160.[10]

By way of summary, the foregoing history shows that, commencing in 1945, the disallowance by *Biddle* of the foreign tax credit with respect to dividends received by a United States taxpayer from a United Kingdom corporation was completely abrogated. At the same time, the effect of *Trico Products* and *Irving Air Chute* was largely nullified by the exemption of royalties and interest from the tax by the source country. Then, in 1957, the effect of *Trico Products* and *Irving Air Chute* was further modified by treaty to permit a credit for taxes deemed paid in respect of nonexempt royalties paid to a United States taxpayer by a United Kingdom payor and this modification was legislatively confirmed by the enactment of the Technical Amendments Act of 1958, which amended section 905(b) of the Internal Revenue Code.[11] Conceivably, there remained a gap relating to a credit for taxes deemed paid in respect of nonexempt interest. Against the possibility that *Biddle* "raises some question" as to creditability of the foreign tax in respect of such interest (see footnote 10, *supra*), this gap was closed in favor of creditability in early 1966.

The year before us is 1965. Respondent's position here is that the aforementioned potential gap should be closed in favor of noncreditability. Petitioner contends that, in fact, there was no gap and that

---

[10] The Technical Memorandum reads, in part, as follows:

"Amended Article XIII also specifically provides that credit shall be allowed for certain taxes which are deducted from payments to U.S. recipients of interest and royalties by individuals resident in the United Kingdom. This provision has limited application because under article VII and article VIII of the convention as amended by the supplementary protocol, tax can be withheld on such payments only where the recipient thereof has a permanent establishment within the United Kingdom and such payment is effectively connected to such permanent establishment. *A specific provision relating to the tax withheld from such payments is required solely because it is not clear that under U.S. statutory law the tax withheld from such payments is creditable by the recipient thereof.* Under United Kingdom law, such payments are nondeductible in the case of an individual for purposes of determining his income subject to the standard rate of income tax. However, such individual is permitted to withhold an amount equal to such standard rate from his payment and retain such amount for his own use. While this method of treating the transaction under United Kingdom tax law has the effect of placing the burden of such tax on the recipient of such interest or royalty, *Biddle* v. *Commissioner* (302 U.S. 573) *raises some question as to whether this tax is creditable under U.S. law.* Consequently, a specific provision dealing with the right of the U.S. recipient to claim credit for such tax in the case of royalty payments was included in article XIII of the existing convention. The amended article XIII continues this rule to the extent it continues to be necessary to do so and extends the same principle to interest payments. United Kingdom income tax withheld from interest and royalties paid by corporations is considered paid by the U.S. recipient of such interest or royalties since it is collectible from the U.S. recipients, and the recipient is therefore entitled to credit for such tax under the amended article XIII. [Emphasis added.]"

[11] See fn. 8 *supra*.

neither *Biddle* nor *Trico Products* nor *Irving Air Chute* should be viewed as compelling the result for which respondent contends. Aside from two very early decisions which did not directly come to grips with the problem of interest received by a United States taxpayer from a United Kingdom source,[12] the precise question has not heretofore been ruled upon by the courts.

Against the foregoing background, we now turn to an analysis of British law as reflected in I.T.A. 1952. Section 1, I.T.A. 1952,[13] imposes an income tax (the rates of which are determined by the annual Finance Acts) on all "property, profits or gains * * * described or comprised" in certain schedules set forth elsewhere in the Act. Schedule D, contained in section 122, I.T.A. 1952, provides, in part, as follows:

Section 122. *Schedule D.—* * * *

1. Tax under this Schedule shall be charged in respect of—

(a) the annual profits or gains arising or accruing—

\* \* \* \* \* \* \*

(iii) to any person, whether a British subject or not, although not resident in the United Kingdom, from any property whatever in the United Kingdom, or from any trade, profession, * * * or vocation exercised within the United Kingdom; and

(b) *all interest of money,* annuities and other annual profits or gains not charged under Schedule A, Schedule B, Schedule C, or Schedule E, and not specifically exempted from tax, [Emphasis added.]

The profits described in schedule D are classified under cases in section 123 I.T.A. 1952, which provides, in pertinent part:

Section 123. *Mode of Charge under Schedule D; the Six "Cases."*—(1) Tax under Schedule D shall be charged under the following Cases respectively, that is to say—

\* \* \* \* \* \* \*

---

[12] *Duckworth Co.,* 24 B.T.A. 304 (1931), involved a question of interest, but the Board of Tax Appeals based its decision on the absence of any evidence of any British law showing that the British tax was imposed on the petitioner (a domestic corporation) rather than a commonly controlled British partnership. Furthermore, an examination of the stipulation therein reveals that the partnership was charged with British tax on the petitioner's income because of "the close relations" between the two. In *Trico Products Corporation, supra,* the Board specifically stated that the parties had not made any separate contention as to interest. See fn. 6 *supra.*

[13] Section 1. *Charge of income tax.*—Where any Act enacts that income tax shall be charged for any year at any rates, then, subject to the provisions of this Act, the tax at those rates shall be charged for that year in respect of all property, profits or gains respectively described or comprised in the Schedules contained in the sections of this Act enumerated below, that is to say—

Schedule A—Section eighty-two;
Schedule B—Section eighty-three;
Schedule C—Section one hundred and seventeen;
Schedule D—Section one hundred and twenty-two; and
Schedule E—Section one hundred and fifty-six,

and in accordance with the provisions of this Act respectively applicable to those Schedules.

Case III—tax in respect of—

(a) any interest of money, whether yearly or otherwise, * * * whether such payment is payable within or out of the United Kingdom * * *

As appears upon examination of the foregoing sections, interest is chargeable with income tax even if the recipient is not a resident of the United Kingdom, provided that the source of the interest, as in the instant case, is in the United Kingdom. *Westminster Bank* v. *Nat. Bank of Greece*, [1971] 2 W.L.R. 105 (H.L. 1970); *Whitney* v. *The Commissioners of Inland Revenue*, [1924–1926] 10 Tax Cas. 88 (H.L. 1925); *Brooke* v. *The Commissioners of Inland Revenue*, [1918] 1 K.B. 257 (C.A. 1917). Compare *Keiner* v. *Keiner*, [1945–1953] 34 Tax Cas. 346 (Q.B. 1952).

British tax at the standard rate is charged either by direct assessment or by deduction of tax at the source. See 1 Simon, Income Tax (1965). The scheme for the collection of the tax on interest is provided by sections 169 and 170, I.T.A. 1952, set forth in pertinent part below:

Section 169. *Payments Out of Profits or Gains Already Taxed.*—(1) Where any yearly interest of money, annuity or other annual payment is payable wholly out of profits or gains brought into charge to tax—

(a) no assessment shall be made on the person entitled to the interest, annuity or annual payment; and

(b) the whole of the profits or gains shall be assessed and charged with tax on the person liable to the interest, annuity or annual payment, without distinguishing the interest, annuity or annual payment; and

(c) the person liable to make the payment, whether out of the profits or gains charged with tax or out of any annual payment liable to deduction, or from which a deduction has been made, shall be *entitled*, on making the payment, to deduct and retain out of it a sum representing the amount of the tax thereon at the standard rate for the year in which the amount payable becomes due; and

(d) the person to whom the payment is made shall allow the deduction on receipt of the residue of the payment, and the person making the deduction shall be acquitted and discharged of so much money as is represented by the deduction, as if that sum had been actually paid.

(2) Subsection (1) of this section shall have effect whether the interest, annuity or annual payment—

(a) is payable within or out of the United Kingdom; or

\*   \*   \*   \*   \*   \*   \*

(c) is payable half-yearly or at any shorter or more distant periods.

(3) Where—

(a) any royalty or other sum paid in respect of the user of a patent * * *

\*   \*   \*   \*   \*   \*   \*

is paid wholly out of profits or gains brought into charge to tax, the person making the payment shall be *entitled* on making the payment to deduct and retain out of it a sum representing the amount of the tax thereon at the standard rate for the year in which the amount payable becomes due.

Section 170. *Payments not Made Out of Profits or Gains Already Taxed.*—(1) Where—

   (a) any interest of money * * * charged with tax under Schedule D; or

   (b) any royalty or other sum paid in respect of the user of a patent * * *

     *       *       *       *       *       *       *

is not payable or not wholly payable out of profits or gains brought into charge, the person by or through whom any payment thereof is made *shall, on making the payment, deduct* out of it a sum representing the amount of tax thereon at the standard rate in force at the time of the payment.

   (2) Where any such payment as aforesaid is made by or through any person, that person shall forthwith deliver to the Commissioners of Inland Revenue * * * an account of the payment, or of so much thereof as is not made out of profits or gains brought into charge, and of the tax deducted out of the payment or out of that part thereof, and the Special Commissioners shall assess and charge the payment for which an account is so delivered on that person.

   (3) The Special Commissioners may, where any person has made default in delivering an account required by this section, or where they are not satisfied with the account so delivered, make an assessment according to the best of their judgment * * *.

   [Emphasis added.]

During the period in question, except in situations not applicable herein, the payor of interest was not allowed a deduction in computing his profits or gains from the carrying on of any trade or business. Secs. 137 and 138, I.T.A. 1952.

Section 524, I.T.A. 1952, defines "total income" and provides, in part:

Section 524.—

     *       *       *       *       *       *       *

   (3) In estimating the total income of any person—

   (a) any income which is chargeable with income tax by way of deduction at the standard rate in force for any year shall be deemed to be income of that year; and

   (b) any deductions which are allowable on account of sums payable under deduction of income tax at the standard rate in force for any year out of the property or profits of that person shall be allowed as deductions in respect of that year * * *.

The question before us is whether, under the foregoing provisions of I.T.A. 1952, the tax paid by petitioner's British subsidiary and deducted by it at the time of payment was imposed upon petitioner. Respondent points to the fact that the tax was payable by the British subsidiary pursuant to section 169 of I.T.A. 1952; that subsection (1) (a) of section 169, I.T.A. 1952, specifically provides that "no assessment shall be made on the person entitled to the interest, annuity or annual payment"; that, under subsection (1) (c) of section 169, I.T.A. 1952, the payor is only "entitled" and not compelled to deduct the amount of the tax at the time the interest is paid, as contrasted with an apparently mandatory provision for deduction under subsection (1) of section 170, I.T.A. 1952; that, therefore, petitioner was not

actually liable for the tax deducted from the payment to it; and that, under the doctrine of *Biddle*, *Trico Products*, and *Irving Air Chute*, the tax is not imposed upon petitioner and it is therefore not entitled to a credit therefor under section 901. For the reasons hereinafter set forth, we disagree.

Initially, it is important to note that I.T.A. 1952 specifically imposes a tax or "charge" directly on interest. Sec. 122, sch. D, 1(b), and sec. 123, case III, (a).

By way of contrast, section 184, I.T.A. 1952, which deals with dividends, speaks in terms of "profits or gains to be charged." [14]

Analysis of British case law indicates clearly that the foregoing distinction is critical. There is no tax or "charge" on dividends as such. See *Neumann* v. *The Commissioners of Inland Revenue*, [1931–1934] 18 Tax Cas. 322, 362 (H.L. 1934); Rowlett, J., in *Purdee* v. *Rex*, [1914] 3 K.B. 112, 116. In the case of corporate profits from which the dividends are paid, the corporation is the taxpayer on its own behalf and not simply a collector on behalf of the Crown. See Lord Atkin in *Commissioners of Inland Revenue* v. *Cull*, [1935–1939] 22 Tax Cas. 603 at 636 (H.L. 1939), and Viscount Simon in *Canadian Eagle Oil Co., Ltd.* v. *The King*, [1947–1948] 27 Tax Cas. 205 at 247–248 (H.L. 1945). The fact that the shareholder is "regarded" as paying the tax appropriate to the dividend (see *Biddle* v. *Commissioner, supra*) merely reflects the ultimate incidence or economic burden of the tax and does not go to the question of imposition of the tax. On the other hand, where an interest obligation is involved, the obligor is the payor of the tax in form only and is considered as having made the payment on behalf of the recipient obligee; sections 169 and 170, I.T.A. 1952, are merely arrangements for the collection of the tax already imposed by the "charge" under sections 122 and 123. See *Inland Revenue Commissioners* v. *Frere*, [1965] A.C. 402, 419–421 (H.L. 1964); *Allchin* v. *Coulthard*, [1943] A.C. 607, 619 (H.L. 1943); *The Corporation of Birmingham* v. *The Commissioners of Inland Revenue*, [1928–1931] 15 Tax Cas. 172, 204 (C.A. 1929), affd. (1928–1931) 15 Tax Cas. 172, 207 (H.L. 1930).[15] But compare *The Commissioners of Inland*

---

[14] That section reads, in pertinent part, as follows:

(1) The profits or gains to be charged on any body of persons shall be computed in accordance with the provisions of this Act on the full amount of the same before any dividend thereof is made in respect of any share, right or title thereto, and the body of persons paying the dividend shall be entitled to deduct the tax at the standard rate for the year in which the amount payable becomes due.

See also fn. 3 *supra*.

[15] In the last cited case, Sankey, *L.J.*, stated:

"In my view Rules 19 and 21 [forerunners of sections 169 and 170, respectively] are not in the nature of substantive law imposing the tax, but rather in the nature of adjective law facilitating its collection. To ensure this object, they provide for the collection of the tax at the source and for preventing a person paying tax upon a sum which is not really his income. * * *"

*Revenue* v. *Dalgety & Co., Ltd.*, [1928–1931] 12 Tax Cas. 216 (H.L. 1930), which involved a special situation arising out of the interplay of the British income tax with the income tax of certain of the dominions.

The dichotomy between the nature of dividends on the one hand and interest on the other points up the inappropriateness of applying the *Biddle* principle to the case at bar. In the first place, it requires no citation of authority to support the proposition that a stockholder has no right to share in earnings and profits at least until a dividend has been declared. On the other hand, the obligee of interest payable absolutely at a fixed rate on a bona fide indebtedness, such as is involved herein,[16] has a legally recognized and enforceable claim for payment when the interest becomes due. Moreover, it should be noted that, in the case of dividends, the standard tax to be deducted by the corporation is the rate in effect for the year in which the amount payable becomes due, i.e., after the dividend is declared and the record date has passed. The Supreme Court specifically pointed to the complications arising out of this potential differential between the rate of tax appropriate to the dividend paid by the corporation and the rate of tax recouped by the corporation. See *Biddle* v. *Commissioner*, 302 U.S. at 576, fn. 3. Compare *Wisconsin Gas Co.* v. *United States*, 322 U.S. at 529. No such differential is involved where an absolute obligation to pay a fixed rate of interest is concerned; the standard rate of tax paid by the corporation and withheld by it from the interest paid is the same, i.e., the rate "for the year in which the amount payable becomes due." See sec. 169, I.T.A. 1952. See also Viscount Simon, L.C., in *Allchin* v. *Corporation of South Shields*, [1944–1945] 25 Tax Cas. 445, 462 (H.L. 1943). Unlike the dividend situation, no further action by the obligor to establish the interest obligation is required. In this context, the impact of the distinction asserted by respondent between the seemingly permissive and mandatory quality of sections 169 and 170, I.T.A. 1952, respectively, loses its force. Under the Federal income tax, an accrual basis taxpayer is entitled to deduct interest to which the obligee of his debt is "entitled" even though the obligee may subsequently decide not to collect that interest, with the result that the interest is not actually paid.[17] The applicability of the Internal Revenue Code in such a situation is predicated upon the reality that the obligee will, in fact, seek to collect the interest to which he is entitled. Similarly, section 169, I.T.A. 1952, assumes the reality of

---

[16] Neither party has argued that the indebtedness herein was not bona fide or that the interest was not payable in all events, i.e., it was dependent upon profits.

[17] The obligor may, of course, be required to pick up as income the amount of the previously deducted interest under the so-called "tax benefit rule." Cf. *United States* v. *Skelly Oil Co.*, 394 U.S. 678 (1969).

recoupment in light of the fact that the obligor of the interest has paid or will pay the tax. It is also significant that, in many situations, the obligor does not know at the time the interest is paid whether or not it will have profits and must necessarily withhold the British standard tax in order to assure compliance with section 170, I.T.A. 1952.

Finally, it should be noted that the operation of the British tax in respect of interest is quite different than it is in respect of dividends in terms of the inequality of economic burden which loomed so large in the Supreme Court's reasoning in *Biddle*. Under the British income tax, interest is not a deduction to the payor United Kingdom corporation; [18] under United States income tax, interest is a deduction to the United States payor. Thus, if *Biddle* had allowed a credit for the foreign tax appropriate to the dividend, there would have been discrimination *in favor of* the United States taxpayer-recipient (see footnote 5, *supra*). The failure to allow a credit in the case of interest will result in discrimination against the United States taxpayer-recipient.[19]

We conclude that *Biddle* does not require us to adopt respondent's position herein. Admittedly, *Trico Products* and *Irving Air Chute* (see pp. 468–469 *supra*) present greater difficulty. It cannot be gainsaid that the British income tax, and particularly sections 169 and 170, I.T.A. 1952, operates in the same manner with respect to royalties as it does with respect to interest. However, it seems clear to us that *Trico Products* and *Irving Air Chute* were decided without a full appreciation of the differences between the British scheme of taxation in respect of dividends on the one hand and royalties on the other.[20] Moreover, we note that there was divergence of opinion between the Board of Tax Appeals and the Court of Appeals for the Second Circuit as

---

[18] One of the major changes in the British scheme of taxation in 1966, which led to the supplementary protocol to the United States—United Kingdom convention (see p. 470 *supra*) was to permit such a deduction. See Statement of Stanley S. Surrey, Assistant Secretary of the Treasury, before the Senate Foreign Relations Subcommittee on Tax Conventions, 2 CCH Tax Treaties at 8167-3—8167-4.

[19] Assume a United States and United Kingdom corporate and individual tax rate of 50 percent and a United States corporation and a United Kingdom corporation, each with $1,000 taxable income before giving effect to an absolute obligation to pay $1,000 interest. If a United States corporation were the obligor, it would get a deduction of $1,000 and have no tax to pay. The United States taxpayer-recipient with no other taxable income would pay $500 tax and be left with $500 net. If a United Kingdom corporation were the taxpayer, it would pay $500 in United Kingdom tax and pay the United States taxpayer-recipient $500. If no credit is allowed and such taxpayer is treated as respondent would have us treat petitioner herein, such taxpayer would include $500 in income, pay $250 in United States tax, and be left with $250 net. If a credit is allowed, such taxpayer would include $1,000 in his United States income, on which the tax would be $500 ; he would then take a credit for $500, leaving him with $500 net, i.e., the same amount he would have had remaining if the payor had been a United States corporation.

[20] Both decisions have been severely criticized. See Owens, The Foreign Tax Credit 385–386 (1961).

to the impact of the presence of profits of the United Kingdom corporation, the Board indicating that the foreign tax credit would be allowable under Rule 21 (the predecessor of section 170) if there were no profits and the Court of Appeals stating that there should be no distinction between a royalty covered by Rule 19 (the predecessor of section 169) and one covered by Rule 21.[21] Compare *Irving Air Chute Co.*, 1 T.C. 880, 889, fn. 3 (1943), with *Irving Air Chute Co.* v. *Commissioner*, 143 F. 2d 256, 260 (C.A. 2, 1944). The abstractness of this distinction was the basis for a lucid dissenting opinion by Judge Learned Hand, which espoused the view that the foreign tax credit should be available in either case. See 143 F. 2d at 260. While the contretemps with regard to whether the result to be reached should be contingent on the existence of profits is not directly applicable herein, the artificiality of the distinction involved does give us pause in accepting respondent's demand that we consider the application of *Biddle* by *Trico Products* and *Irving Air Chute* controlling upon us. Our hesitancy is compounded by the subsequent history of the United States–United Kingdom convention which substantially negated the effect of those decisions. See pp. 469–471 *supra*. In any event, that history makes it unnecessary for us to determine whether *Trico Products* and *Irving Air Chute* were correct under the circumstances that existed at the time those cases were decided. Consequently, and also in view of the fact that the precise issue dealt with in those cases is not involved herein, we have no need to consider the impact of *Jack E. Golsen*, 54 T.C. 742 (1970), affd. 445 F. 2d 985 (C.A. 10, 1971).[22]

Finally, we do not consider the fact that, under section 169, I.T.A. 1952, the tax may not be assessed by the Crown directly against the recipient of the interest as determinative. The test does not rest upon a search for the person from whom the tax is collectible but rather for the person upon whom the tax is imposed. In this connection, we note in respect to United States income tax on wages that the tax is imposed on the employee but the responsibility and liability for withholding is placed upon the employer. If the tax is withheld, the employee is entitled to credit therefor even though the amount withheld is not paid to the United States Government by the employer. Secs. 31, 3402, and 3403; sec. 1.31–1, Income Tax Regs.[23] A comparable system

---

[21] The distinction between the application of the two rules was based upon the use of the word "entitled" with respect to the deduction of the British tax under Rule 19 and the apparently mandatory deduction language under Rule 21—a distinction urged upon us herein by respondent.

[22] Respondent has not suggested that we should apply the *Golsen* rule.

[23] Cf. *Joseph E. Harrod,* T.C. Memo. 1961–300. Moreover, our system of withholding in respect of wages operates in a manner similar to the British standard tax on interest, in that an employer who fails to withhold or underwithholds may collect the amounts by which the withholding is deficient through deductions from subsequent remuneration paid to the employee in the calendar year "even though the remuneration, for any reason, does not constitute wages." See sec. 31.6205–1(c)(4), Income Tax Regs.

operates with respect to tax withheld at source generally. Secs. 1441, 1442, 1451, 1461, and 1462.

After careful consideration, we conclude that the British standard tax involved herein was actually imposed upon petitioner and that, purely as a matter of collection, it was obtained by the Crown through payment by Limited on petitioner's behalf. See sec. 1.901–2(a), Income Tax Regs. Cf. *Chicago, Burlington & Quincy RR Co.* v. *United States* (Ct. Cl. 1972, 29 A.F.T.R. 2d 72–707, 72–1 U.S.T.C. par. 9253) ; *Arundel Corp.* v. *United States, supra; Singer Mfg. Co.* v. *United States*, 87 F. Supp. 769 (Ct. Cl. 1950). Compare Rev. Rul. 68–148, 1968–1 C.B. 340.

We end this opinion where we began, namely, with the observation of Mr. Justice Holmes that "a page of history is worth a volume of logic." See p. 466 *supra*. Concededly, there is a certain theoretical symmetry in respondent's argument that *Biddle, Trico Products*, and *Irving Air Chute* demand that the foreign tax credit claimed herein be disallowed. But we refuse to be seduced by respondent's siren song of symmetry and our analysis convinces us that logic does not require us to adopt respondent's position. Certainly the historical development of the underlying issue herein imposes no such requirement. Compare *Penn Mutual Indemnity Co.*, 32 T.C. 653 (1959), affd. 277 F. 2d 16 (C.A. 3, 1960).

*Decision will be entered for the petitioner.*